UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| | | |
|---|---|---|
| OSEN LLC, | : | |
| | : | Case No. 18-cv-6070-JSR |
| Plaintiff, | : | |
| | : | |
| -against- | : | |
| | : | |
| UNITED STATES DEPARTMENT OF STATE, | : | |
| | : | |
| Defendant. | : | |

-----------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**


**OSEN LLC**

Michael J. Radine
William A. Friedman
1441 Broadway, Suite 6022
New York, NY 10018
Tel.: 212.354.0111

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

BACKGROUND ....................................................................................................................... 1

I.   Plaintiff's Requests ........................................................................................................ 1

II.  The Subject Matter of the Records .............................................................................. 2

ARGUMENT ............................................................................................................................ 6

I.   Standard of Review ....................................................................................................... 6

II.  State Inappropriately Redacted Information That Is Publicly Available. ........................ 7

A.   Information in the Public Domain Presumptively Does Not Harm National Security. ... 7

1.   Because the Cables at Issue Are Available on the WikiLeaks Website, There is No Further Danger in Releasing Them. ................................................................................. 7

2.   WikiLeaks Is a Reliable Source for the Content of the Cables. ..................................... 9

B.   Officially Disclosed Information Cannot Be Withheld Without Following Procedures Not Followed Here ......................................................................................................... 12

III. State's Reclassification of the Cables ......................................................................... 14

A.   The Cables Were Each Declassified (and While Available on WikiLeaks). ................. 14

B.   State's Grounds for Reclassifying the Cables Are Unjustifiable. ................................. 15

CONCLUSION ....................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*A. Michael's Piano, Inc. v. F.T.C.*,
    18 F.3d 138 (2d Cir. 1994) ............................................................................. 6

*ACLU v. Dep't of Def.*,
    229 F. Supp. 3d 193 (S.D.N.Y. 2017) ......................................................... 6, 7

*Campbell v. U.S. Dep't of Justice*,
    164 F.3d 20 (D.C. Cir. 1998) ........................................................................ 7

*Dep't of Air Force v. Rose*,
    425 U.S. 352 (1976) ...................................................................................... 6

*King v. U.S. Dep't of Justice*,
    830 F.2d 210 (D.C. Cir. 1987) ...................................................................... 7

*N.Y. Times Co. v. U.S. Dep't of Justice*,
    756 F.3d 100 (2d Cir.) ................................................................................. 12

*U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*,
    576 F.3d 1040 (9th Cir. 2009) ..................................................................... 11

*Wash. Post v. U.S. Dept. of Defense*,
    766 F. Supp. 1 (D.D.C. 1991) .................................................................... 7, 8

*Wilson v. C.I.A.*,
    586 F.3d 171 (2d Cir. 2009) .......................................................................... 8

**Statutes**

5 U.S.C. § 552 ...................................................................................................... 5

**Other Authorities**

Executive Order 13,526,
    75 Fed. Reg. 707 (Dec. 29, 2009) ......................................................... 2, 11, 13

Prof. Yochai Benkler, *A Free Irresponsible Press: Wikileaks and the Battle Over the Soul of the Networked Fourth Estate*,
    46 Harv. C.R.-C.L. L. Rev. 311 (2011) ...................................................... 11

U.N. Doc. S/RES/1511 (Oct. 16, 2003) ............................................................... 2

**Rules**

Fed. R. Evid. 901 ............................................................................................... 11

Fed. R. Evid. 901(a).................................................................................................... 10

Rule 901(b) ................................................................................................................. 10

**Regulations**

32 C.F.R. § 2001.1 ...................................................................................................... 15

32 C.F.R. § 2001.12(b) (2010)................................................................................... 15

Plaintiff Osen LLC seeks the release of 26 declassified cables relating to the U.S. presence in Iraq from 2003-2011 that Defendant U.S. Department of State ("State") **re**classified in response to Plaintiff's FOIA requests. *See* Exhibits 1-26 of the Declaration of Michael J. Radine ("Decl.," annexing "Exhibits") and Decl. ¶ 3. As shown below, reclassification of these cables is inappropriate where they are (a) already publicly available online without redaction and (b) relate to events that occurred over a decade ago in a conflict the U.S. has since departed.

## BACKGROUND

### I.      Plaintiff's Requests

Plaintiff represents hundreds of U.S. service members who were killed or injured in Iranian-backed terrorist attacks (the "Attacks") while serving in Iraq, as well as their families (collectively, the "Victims"). The Victims retained Plaintiff to bring civil suits against Iran and its instrumentalities under the Foreign Sovereign Immunities Act for allegedly causing and materially supporting acts of extrajudicial killing and personal injury resulting from the Attacks, and several international corporations for allegedly conspiring with Iran to provide that material support.

To establish Iran's role in causing the attacks in Iraq, Plaintiff requested 42 specific records relating to Iranian malign interference in Iraq during the relevant period from State. Plaintiff selected these records from footnotes in Michael Gordon and the late General Bernard E. Trainor's seminal history of the Iraq War, *The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama* (Vintage 2013). Nearly all of these records have been available, without redactions, on the WikiLeaks website since 2010.

Plaintiff made two rounds of FOIA requests, each identifying documents with as much information as was available to Plaintiff. State failed to make any determination as to whether it would produce or withhold the requested records, required by FOIA, and did not even acknowledge the second set of requests until Plaintiff initiated this lawsuit. After the

1

commencement of the suit, State located 40 of the requested records, but withheld significant portions of 29 of them—principally portions relating to Iran's role in fomenting violence in Iraq. Twenty-six of the 29 documents are available on WikiLeaks, and therefore their contents are publicly available. Further, as shown below, reviewing the content redacted by State but disclosed on WikiLeaks confirms that the withheld material—relating to well-publicized facts about a conflict that concluded nearly a decade ago—is not such that "reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe." Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13526), § 1.2(2).

## II.    The Subject Matter of the Records

U.S. and allied forces (generally referred to as "Coalition Forces" and, until January 1, 2010, formally organized into a command component called "Multi-National Forces-Iraq" or "MNF-I") invaded Iraq on March 20, 2003. Coalition Forces ceased major combat operations on May 1, 2003 and began peacekeeping operations, which were later authorized by the U.N. Security Council. *See* S.C. Res. 1511, para. 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003). Iran, which was already developing political and paramilitary networks of like-minded Shi'a Muslim coreligionists in Iraq, began a campaign aimed at increasing its influence in Iraq and pushing Coalition Forces out of the country. A major component of its efforts involved orchestrating hundreds of terrorist attacks against Coalition peace keeping forces, along with attacks against Iraqi security forces and civilians.

Iran did so in part by developing Iraqi Shi'a terrorist groups, called "Special Groups" by the U.S. military, and providing them with sophisticated weapons, training, funding, and other support. Specifically, Iran developed and supported political and militant groups like Jaysh al-Mahdi ("JAM," also called the Mahdi Army) led by the central Shi'a figure Muqtada al-Sadr, and

its spinoff Special Groups, Asaib Ahl al-Haq and Kata'ib Hezbollah (a designated Foreign Terrorist Organization ("FTO")). Iran also funded political parties, principally the Da'wa Party and the Supreme Council for Islamic Revolution in Iraq ("SCIRI," later, the Islamic Supreme Council of Iraq ("ISCI")), along with SCIRI's armed wing, the Badr Corps (variously called the "Badr organization" and "Badr militia"). *See* Exhibit 22 ¶¶ 7, 14 (unredacted discussion of "Iran's (including IRGC's) patronage of SCIRI, Badr, and other pro-Iranian Shia groups" and "the financial sponsorship and likely operational direction of the Badr militia by the IRGC-QF [*see infra*].""). *See also* Exhibit 36, at 7 (describing Iran's patronage of SCIRI/Badr, Da'wa, JAM, and others).

Chief among the weapons Iran supplied to these groups was the explosively formed penetrator ("EFP"), a specialized type of roadside bomb designed to penetrate the armor on Coalition vehicles. EFPs of the type provided by Iran were generally made with a precision manufactured concave copper disk liner and high-energy explosive, such as C-4, packed behind the liner. Once detonated, the explosive wave, moving at more than 8,000 meters per second, would strike the copper disk liner on the front, turning it into a "tadpole-shaped slug" weighing several pounds that traveled forward at "2,000 meters per second." Rick Atkinson, "There was a two-year learning curve . . . and a lot of people died in those two years," Wash. Post (Oct. 1, 2007) ("An EFP eight inches in diameter threw a seven-pound copper slug at Mach 6, or 2,000 meters per second."), *available at* http://www.washingtonpost.com/wp-dyn/content/article/ 2007/09/30/AR2007093001675_5.html?sid=ST2007092900754.[1]

Iran developed and armed these groups through its "Qods Force," a division of Iran's Supreme Leader's militia, the Islamic Revolutionary Guard Corps ("IRGC"). *See, e.g.*, Exhibit 22

---

[1]     This information, readily available since at least 2007, is redacted from the cables.

¶ 14 (noting "a dark, menacing undercurrent of aggressive IRGC activity inimical to U.S. interests in Iraq's center-south."). The U.S. designated the Qods Force ("IRGC-QF") a Specially Designated Global Terrorist ("SDGT") on October 25, 2007 for "provid[ing] lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians," Press Release, U.S. Dep't of the Treasury, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism (Oct. 25, 2007), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx (designating IRGC-QF). Treasury designated the IRGC as a whole on October 13, 2017 for "play[ing] a central role to Iran becoming the world's foremost state sponsor of terror," and "provid[ing] material support to the IRGC-QF, including by providing training, personnel, and military equipment." Press Release, U.S. Dep't of the Treasury, Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority (Oct. 13, 2017) *available at* https://www.treasury.gov/press-center/press-releases/Pages/sm0177.aspx. The U.S. also designated IRGC-QF's notorious commander, Qasem Soleimani, three times. Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Five Individuals Tied to Iranian Plot to Assassinate the Saudi Arabian Ambassador to the United States (Oct. 11, 2011) (describing Soleimani's various designations), *available at* https://www.treasury.gov/press-center/press-releases/pages/tg1320.aspx.

The development of and training in EFPs and other battlefield tactics came from Iran's Lebanese terror proxy, Hezbollah, a designated SDGT and FTO. As State itself has previously publicly disclosed, "[d]espite its pledge to support Iraq's stabilization, Iran trained, funded, and provided guidance to Iraqi Shia militant groups. The IRGC-QF, in concert with Lebanese Hizballah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the

construction and use of sophisticated improvised explosive device technology and other advanced weaponry." Exhibit 37, at 173-72. The "sophisticated improvised explosive device ['IED'] technology" refers to the EFP. *See id.* ("The . . . (IRGC)-Qods Force, continued to provide Iraqi militants with . . . explosively formed projectiles (EFPs) that have a higher lethality rate than other types of [IEDs], and are specially designed to defeat armored vehicles used by Coalition Forces." *See also id.* at 281 ("Since at least 2004, Hizballah has provided training to select Iraqi Shi a militants, including the construction and use of [EFPs] that can penetrate heavily armored vehicles, which it developed in southern Lebanon in the late 1990s.").

EFPs were smuggled into Iraq through various networks, such as a network run by designated terrorist Abu Mahdi al-Muhandis. *See* Press Release, U.S. Dep't of the Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009) ("al-Muhandis led networks that moved ammunition and weapons—to include explosively formed penetrators (EFPs)—from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces."), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg195.aspx. *See also* Exhibit 22 ¶ 14 (unredacted discussion of "[m]unitions and weapons trafficking supported by the IRGC [which] continues to be an explicit threat to Coalition Forces").

IRGC-QF agents infiltrated Iraq in great numbers. "Qods Force officers often use various cover mechanisms – including diplomatic, non-governmental organization, humanitarian, and media – for conducting operational activity, belying their military affiliation." Press Release, U.S. Dep't of the Treasury, Treasury Designates Individuals, Entity Fueling Iraqi Insurgency (Jan. 1, 2008), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp759.aspx. In a famous raid, the U.S. captured 5 Iranian IRGC agents in Erbil, Iraq—sometimes called the "Erbil

5"—who were operating under diplomatic cover. *See* Exhibit 34, ¶¶ 3-7. They were detained for nearly a year, before being released to Iran.

After recognizing the emerging threat from the Special Groups, the MNF-I started targeting their members. The U.S. detained and interrogated Asaib Ahl al-Haq founder Qais al-Khazali (U.S. Central Command recently released nearly a thousand pages of summaries from those interrogations. *See* http://www.aei.org/spotlight/qayis-al-khazali-papers/ and Exhibit 38, which is an excerpt from those summaries), along with Hezbollah and IRGC agents operating in Iraq. MNF-I established "Task Force 17" to target "counter Iranian malign influence" by targeting these actors.

**ARGUMENT**

## I.      Standard of Review

FOIA's "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act. 'These exemptions are explicitly made exclusive' . . . and must be narrowly construed." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973)). This Court reviews State's decision to withhold records under a FOIA exemption *de novo*. 5 U.S.C. § 552(a)(4)(B). *See ACLU v. Dep't of Def.*, 229 F. Supp. 3d 193, 207-08 (S.D.N.Y. 2017) ("[u]nlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'") (quoting *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 755 (1989)), *rev'd on other grounds* 229 F. Supp. 3d 193 (2d Cir. 2017). "*De novo* review was deemed essential to prevent courts reviewing agency action from issuing a meaningless judicial imprimatur on agency discretion." *A. Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 141 (2d Cir. 1994) (noting Congress's "general, firm philosophy of full agency disclosure").

State must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld *logically* falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *ACLU*, 229 F. Supp. 3d at 207 (quoting *Wilner v. Nat'l Sec. Agency,* 592 F.3d 60, 73 (2d Cir. 2009)) (emphasis added). State "must provide an accounting of *how* it reached its conclusion, so that the court has 'an adequate foundation to review' whether the Government has satisfied its burden." *Id.* (quoting *Campbell v. United States Dep't of Justice,* 164 F.3d 20, 30 (D.C. Cir. 1998)).

Explaining *how* it reached its conclusions is also necessary "to afford the FOIA requester a meaningful opportunity to contest" them. *Campbell*, 164 F.3d at 30 (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987)). "Specificity is the defining requirement of the *Vaughn* index and affidavit" and cannot be "conclusory[,] . . . too vague or sweeping. To accept an inadequately supported exemption claim would constitute an abandonment of the trial court's obligation under the FOIA to conduct a *de novo* review." *King*, 830 F.2d at 219. Thus, while State's national security determinations are afforded "substantial weight," "deference is not equivalent to acquiescence . . . ." *Campbell*, 164 F.3d at 30.

## II.    State Inappropriately Redacted Information That Is Publicly Available.

### A.    Information in the Public Domain Presumptively Does Not Harm National Security.

#### 1.    Because the Cables at Issue Are Available on the WikiLeaks Website, There is No Further Danger in Releasing Them.

Disclosure of information already in the public domain presents a diminished threat to national security. "It is a matter of common sense that the presence of information in the public domain makes the disclosure of that information less likely to 'cause damage to the national security.'" *Wash. Post v. U.S. Dept. of Defense*, 766 F. Supp. 1, 9 (D.D.C. 1991) (quoting E.O.

12356 § 1.3(b), predecessor to the current E.O. 13526). "In other words, if the information has already been disclosed and is so widely disseminated that it cannot be made secret again, its subsequent disclosure will cause no *further* damage to the national security." *Id.* Here, each of the cables at issue is available, in full and without redaction, from WikiLeaks.

Following an unofficial disclosure, the D.C. Court of Appeals has "only allowed the withholding of information already in the public domain based upon a specific explanation for continued withholding of that information, supported by appropriate agency declarations, of why formal release of information already in the public domain threatens the national security." *Id.* at 10. The *Washington Post* court identified three reasons why an agency may be able to justify continued withholding: where "revealing the context in which the information is discussed would itself reveal additional information, release of which is harmful to the security," (2) where "official confirmation or acknowledgment of that information may be harmful to national security," and (3) "where confidential sources are involved, there is some value in keeping an agency's promise not to reveal the identity of a source even when the source's identity is already known." *Id.*

However, none of these exceptions apply here. First, no "context" will be revealed by State that will reveal additional national security-sensitive information, nor has State suggested otherwise. Second, official confirmation threatens national security in situations where, for instance, "foreign governments can . . . ignore unofficial disclosures of CIA activities that might be viewed as embarrassing or harmful to their interests," but cannot "so easily cast a blind eye on official disclosures made by the CIA itself, and they may, in fact, feel compelled to retaliate." *Wilson v. C.I.A.*, 586 F.3d 171, 186 (2d Cir. 2009). *See Wash. Post*, 766 F. Supp. at 10 ("a country may be able to countenance unacknowledged covert activities within its territories, [but] once those activities are officially confirmed it may be forced by domestic political pressure to retaliate

8

diplomatically or otherwise.") *Id.* These cables recount conversations or observations about well-known issues—both Iran's interference in Iraq and Iraq's displeasure with that interference—and official confirmation will not embarrass either country. Finally, none of the records relate to confidential informants. A conversation off the record is not the same as a confidential informant—and many of the redacted passages involve conversations that were not even off the record. *See* Exhibit 4 ¶ 4 (former Iraqi National Security Advisor Muwaffak al-Rubaie "asked that this comment be made a part of the permanent minutes of the meeting.").

## 2. WikiLeaks Is a Reliable Source for the Content of the Cables.

From February 18, 2010 through September 1, 2011, WikiLeaks published over 250,000 State cables on its website. Most of these cables were sent to WikiLeaks in April 2010 by (at the time of her court martial trial), Private First Class Chelsea Manning. *See* Exhibit 27, ¶ 11(g). According to her statement in that trial, Ms. Manning copied tabular data constituting nearly 1,000,000 documents, including nearly 500,000 U.S. Army "Significant Activity reports" and the quarter-million diplomatic cables. After downloading the cables, she saved them onto a CD-RW (a rewriteable CD-ROM), then compressed them with "zipping" software and copied the compressed data files onto rewriteable CD-ROMs. *Id. See also id.* ¶¶ 4(h)-(m) (describing the zipping process). She then copied the compressed files from those CD-ROMs onto her personal laptop computer, and then from her laptop to a Secured Digital memory card ("SD card") she used for her digital camera. *Id.* ¶¶ 6(a)-(c). During a mid-tour leave, she uploaded the data to WikiLeaks via the WikiLeaks submission system using "The Onion Router," a system that anonymizes online activity. *Id.* ¶¶ 6(q)-(t). WikiLeaks then decompressed the files and reconstituted this tabular data into a template similar to that used by State.

Following the leak, the Department of Defense formed an Information Review Task Force ("IRTF") to evaluate the records published by WikiLeaks. The IRTF issued its final report on June

15, 2011, confirming that it conducted a "line-by-line review of every [State] report" and found that "[t]he compromised diplomatic cables are derived from the [State] database." Exhibit 29 at 12. *See also id.* at 72 ("Based on information being publicly released by WikiLeaks and its media partners, the IRTF has confirmed that as many as 251, 287 cables from the [State] database have been compromised"). State has also acknowledged generally that its cables were published on WikiLeaks. *See, e.g.*, Press Briefing, Ass't Sec'y Philip J. Crowley, (Dec. 1, 2010) ("First and foremost, somebody inside the United States Government who has authorized access to this material, downloaded it and passed it to someone who is not authorized to have it. That is a crime and we are investigating that crime and we'll hold the people responsible fully accountable."), *available at* https://web.archive.org/web/20101203165651/https://www.state.gov/r/pa/prs/dpb/2010/12/152235.htm. The government has also acknowledged that other information on WikiLeaks is specifically accurate.[2]

To authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Here, Plaintiff claims that the WikiLeaks versions contained in Exhibits 1-26 are accurate copies of the cables Plaintiff is challenging. Rule 901(b) provides a non-exhaustive list of examples "of evidence that satisfies this requirement." As shown below, Plaintiff has significant evidence pertaining to the following examples: "comparisons to authenticated versions of the evidence," Rule 901(b)(3), and "evidence about a process or system that produces accurate results," Rule 901(b)(9).

---

[2]     One IRTF investigator, comparing unique document identifiers called "report keys" on WikiLeaks to original versions, "concluded the hundreds of thousands of compromised report keys and the original report keys . . . were *identical*." Exhibit 27 ¶ 10 (emphasis added).

10

*First*, the cables on WikiLeaks relevant here can be authenticated by "comparison with an authenticated specimen"—the versions produced by State to Plaintiff. A comparison of the unredacted body text in each of the 38 cables released by State for which Plaintiff could locate a corresponding WikiLeaks record shows that the records are identical. *See* Decl. ¶ 2. The likelihood that the *redacted* language—and nothing else—was somehow altered is vanishingly small. Moreover, unlike Wikipedia, WikiLeaks is not editable by the public. *See* Prof. Yochai Benkler, *A Free Irresponsible Press: Wikileaks and the Battle Over the Soul of the Networked Fourth Estate*, 46 Harv. C.R.-C.L. L. Rev. 311, 320 (2011) (noting that a contrary report "appears to be either a misunderstanding driven by the 'Wiki' part of the name or deliberate mischaracterization."). Because credibility is central to WikiLeaks's goals, it "goes out of its way to make sure the documents it posts are authentic . . . ." *Id.* (quoting David Sarno, *Burst of Leaks Getting Slippery*, L.A. TIMES, Apr. 16, 2008, at E1).

*Second*, the technical process by which WikiLeaks published the nearly one million files transferred by Ms. Manning makes any inaccuracies in or manipulation of the data unlikely (especially to the limited portions that were redacted by State). As explained above, Ms. Manning transferred the data onto several media and then onto the WikiLeaks website exclusively by using computer software. Computerized copying, unlike manual processes, is a "process or system" that generally "produces an accurate result." Fed. R. Evid. 901(9). *See, e.g.*, *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1044–45 (9th Cir. 2009) (crediting testimony as to how information was transferred into a computer system). WikiLeaks staff then almost certainly used computer software to extract and publish that data onto its website—any manual means would

be virtually impossible given the sheer volume of data transferred. Again, unlike Wikipedia, WikiLeaks does not allow public editing or posting of documents on its site.[3]

### B.   Officially Disclosed Information Cannot Be Withheld Without Following Procedures Not Followed Here.

Official disclosures waive the relevant FOIA exemption altogether. "Voluntary disclosures of all or part of a document may waive an otherwise valid FOIA exemption." *N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 114 (2d Cir.), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014) (citation omitted). The operative Executive Order prohibits classifying officially disclosed information except under strict procedures that State has not claimed to have followed. *See* E.O. 13,526 § 1.7(c) (requiring, *inter alia*, *undelegated* approval from the agency head, recovery of the released information, and prompt notification of certain executive offices).

Withholding information due to a FOIA exemption is waived when it is as specific as the information previously released, matches the information previously disclosed, and was made public through an official and documented disclosure. *N.Y. Times*, 756 F.3d at 120 (citing *Wilson v. C.I.A.*, 586 F.3d 171, 186 (2d Cir. 2009)). Further, "we do not understand the 'matching' aspect of the *Wilson* test to require absolute identity. Indeed, such a requirement would make little sense. A FOIA requester would have little need for undisclosed information if it had to match precisely information previously disclosed." *Id.*

State and U.S. Department of Defense ("DoD") components, which are even more responsible for protecting national security information, have officially disclosed vast amounts of information that meet the *Wilson* standard in that they are: (1) as specific as that withheld here,

---

[3]      The point is not to extol WikiLeaks for illegally publishing then-classified U.S. diplomatic cables, but simply to note that evidence overwhelmingly suggests that with respect to the documents at issue, the WikiLeaks versions are reliable.

such as accounts of "frank discussions" with Iraqi politicians or military operations in Iraq; (2) match the withheld information, in that the information relates to the same Iraqi politicians and the same issues of Iranian interference; and (3) were publicly disclosed, either in response to FOIA or *Touhy* requests or as part of press releases or other publications. These disclosures include State "Country Reports on Terrorism,"[4] dozens of weekly updates on the security, economic, political, and diplomatic situation in Iraq from the MNF-I Commander to the Secretary of Defense ("Weekly Updates"), State and Treasury designations of terrorists and terrorist organizations, and countless other documents.

For instance, U.S. Central Command has disclosed Prime Maliki's impressions of visits with the Iranians as to their interference in Iraq, which is withheld by State: "Turning now to diplomacy, Iranian Foreign Minister Mottaki visited 31 October and met with key GOI [Government of Iraq] officials including Prime Minister Maliki, Vice Presidents Hashemi and Mahdi, and President Talibani. . . . [T]he PM told us Mottaki assured him the illicit weapons flows had stopped." Exhibit 29. As shown below, the language is substantially similar to language withheld by State.

In another Weekly Update, General Petraeus recounted closed-door conversations with Mr. Rubaie, Prime Minister Maliki, and U.S. Ambassador to Iraq Zalmay Khalilzaid, and on national security issues and military plans:

> [T]he Prime Minister is not reticent to use the Iraqi Special Operations Forces to conduct aggressive operations against both Sunni and Shi'a extremists. Rather, what vexes him is that he is informed of their operations when they occur or immediately thereafter. . . . The National Security Advisor, Dr. Rubaie, was even more passionate in his meetings, to include providing a list of demands, all of which revolved around respecting Iraqis in procedurally demonstrable ways. While the demands he provided would have constrained our mission at unacceptable levels, Ambassador Khalilzad and I were able to convey to him that we certainly do respect

---

[4]     State Department Country Reports on Terrorism are available for the years 2000-2017 here: https://www.state.gov/j/ct/rls/crt/. An excerpt is in Exhibit 37.

their sovereignty and that the whole point of the Baghdad Security Plan was to give them the chance to exercise it more effectively.

Exhibit 30.

The designations of prominent agents of Iran, such as Abu Mustafa al-Sheibani (redacted out of Exhibit 22, *see infra*), Abu Mahdi al-Muhandis (redacted out of Exhibit 3), Qasem Soleimani (redacted several times), the IRGC, the IRGC-QF, and countless other actors involved in Iran's interference in Iraq cover much of the same territory. As described further below, military actions and special operations are described in detail in disclosed documents, *see* Exhibits 31, 35, 39, 40, and interrogation summaries are released in the thousands of pages, *see* Exhibits 34, 38.

## III.    State's Reclassification of the Cables

### A.    The Cables Were Each Declassified (and While Available on WikiLeaks).

State has **re**classified each of the cables at issue, extending their classification periods indefinitely. All of the records at issue were originally classified "secret," and therefore must "be marked for declassification 10 years form the date of the original decision." E.O. 13526 § 1.5(b). An agency can only set a longer classification period for information marked secret that identifies confidential sources or relates to "key design concepts of weapons of mass destruction" ("WMD"), *id.* § 1.5(a), and "no information may be classified indefinitely," *id.* § 1.5(d). Indeed, all but three of the requested cables were marked for declassification on the 10-year anniversary of their original classification—all of which dates have since passed—and the remaining three appear to have been marked in error, as they do not identify confidential informants or provide key WMD design concepts (indeed, one of them was produced by State completely unredacted despite a 2021 declassification date).

Because "the information is *automatically declassified* upon the occurrence of the date or event," 32 C.F.R. § 2001.12(b) (2010) (emphasis added)[5], these cables became declassified on the 10-year anniversaries of their original classification. Each of the records at issue, therefore, have already been declassified, and were therefore publicly available on WikiLeaks *as declassified documents*. And while the Executive Order does permit reclassification under certain circumstances, these time limits demonstrate the Executive Order's recognition of FOIA's preference for disclosing information and of the fact that all information becomes stale over time.

**B.    State's Grounds for Reclassifying the Cables Are Unjustifiable.**

The grounds State relies on for reclassifying the information, however, do not appear susceptible to *any* time limitation. Its three grounds for its Exemption 1 withholdings are:

1.  The cables "recount the statements of foreign officials while analyzing the import of those statements for the conduct of United States foreign affairs";

2.  The cables "contain discussions of U.S. military plans, operations, or capabilities";

3.  The cables relate to "intelligence activities, including sources and methods."

State's Mem. of Law ("State Mem.") at 8.

The first ground is premised on the concern that if "senior foreign officials' candid assessments of sensitive affairs are disclosed, they and other foreign officials will be less likely to convey sensitive information to the United States government in the future." *Id.* at 9. Concerns about "other foreign officials" are presumably indefinite. State also argues that the Iraqi politicians themselves "remain active in Iraqi politics today," *id.* at 8, and some could presumably remain active for decades, far beyond the 10-year limitation (in reality, however, they are not necessarily

---

[5]     These provisions implement E.O. 13,526, and are "binding on agencies," including "any 'Executive agency' as defined in 5 U.S.C. § 105; any "Military department" as defined in 5 U.S.C. § 102; and any other entity within the executive branch that comes into the possession of classified information." 32 C.F.R. § 2001.1.

"active in politics today"—former president Talabani is dead and others, such as Hoshyar Zebari and Nouri al-Maliki have left or are leaving government service).[6]

Moreover, the subject matter—Iranian interference in Iraqi security affairs and Iraqi attempts to deal with that interference—is so well-known and for so long as to be entirely stale. Officially released documents talk openly about Iraqi politicians' private conversations and security issues of precisely the time redacted by State. Moreover, the off-the-record conversations redacted by State largely reflect positions that the Iraqi politicians could hardly want to keep secret—they overwhelmingly support U.S. forces and admonish Iranian violence (whether or not to please their American interlocutors).[7] The politicians' views on Iraq are the same that they have stated in news interviews.[8] Regardless, if the concern of exposing that certain politicians took a position in fact poses a serious harm to national security, State could simply redact the names of the officials.

The second ground fails to recognize that the last U.S. forces left Iraq *seven years ago*, MNF-I command was dissolved nearly nine years ago, and the Special Groups (regrettably) have

---

[6]    *See* Mark McDonald, Jalal Talabani, Kurdish Leader and Iraq's First Postwar President, Is Dead at 83, N.Y. Times (Oct. 3, 2017) (Talabani's death), *available at* https://www.nytimes.com/2017/10/03/obituaries/jalal-talabani-kurdish-dead.html; Saif Hameed, Ahmed Rasheed, Iraqi finance minister sacked, risking economic fallout, Reuters (Sept. 21, 2016) (Zeybair removed from government), *available at* https://www.reuters.com/article/us-mideast-crisis-iraq-politics/iraqi-finance-minister-sacked-risking-economic-fallout-idUSKCN11R1DV; Mina Aldroubi, Iraq's former PM Nouri Al Maliki 'not welcome' in new government The Nat'l (Jun 14, 2018) (Maliki not to join next government), *available at* https://www.thenational.ae/world/mena/iraq-s-former-pm-nouri-al-maliki-not-welcome-in-new-government-1.740193.

[7]    For instance, State redacted the following paragraph: "PM Maliki opened by congratulating General Odierno on his promotion and position as Commanding General Multi-National Force-Iraq. General Odierno replied that it was his honor to return to Iraq and that his primary goal was for the Government of Iraq (GOI) to achieve full sovereignty and to take full control of Iraq. The CG said that he would do whatever he could to assist in this process, as it was very important to him personally." Exhibit 13. Why redacting these pleasantries is necessary is inexplicable.

[8]    *See, e.g.*, Martin Chulov, Qassem Suleimani: the Iranian general 'secretly running' Iraq, Guardian (July 28 2011) ("'He is the most powerful man in Iraq without question,' Iraq's former national security minister, Mowaffak al-Rubaie, told the newspaper al-Sharq al-Awsat in July 2010. 'Nothing gets done without him.'"), *available at* https://www.theguardian.com/world/2011/jul/28/qassem-suleimani-iran-iraq-influence.

been reconstituted into quasi-official "Popular Mobilization Units."[9] CENTCOM has disclosed countless documents detailing specific military operations against the Special Groups. For instance, in a document released via FOIA, MNF-I Commander General Petraeus reported:

> We also conducted some good operations against Shi'a extremists this past week, and they have given us new insights into the continued Iranian involvement with JAM Special Groups. TF 17 rolled up the Tier 1 Special Group leader Nassir Farhan and all four Special Group members (one KIA) of a cell that returned from training on explosives in Iran in October. All but Farhan are talking in interrogation, and exploitation of the detainees indicates that they all participated in intensive training near Tehran within the last three weeks. They admitted to staging in Amarah, being met by Qods Force personnel just across the Iranian border with Maysan Province, and then being taken to Tehran for explosives, weapons, sniper, surveillance, and communications security training. In the coming weeks, we hope to gain more insights from the detainees into Iran's support to these groups.

Exhibit 31, at 1. *See also* Exhibit 39, at 4 ("Significant action led by our Green Berets with Iraqi forces against rogue JAM elements in Karbala last Friday. Heliborne assault led to capture of a JAM BDE [Brigade] commander and likely killing of three battalion commanders."); Exhibit 40. CENTCOM has also released dozens of reports describing the interdiction of IRGC and Hezbollah agents in Iraq. *See, e.g.*, Exhibits 38 and 42.

The government has also officially disclosed security issues among Iraqis, which is frequently (if inconsistently) redacted in the cables at issue. For instance, there are several officially disclosed reports as to the Badr Corps' interference in the Najaf, Iraq police force, including in the unredacted portion of Exhibit 22 ¶ 5 ("while in Najaf the governor used Badr militia forces to install forcibly the favored [police chief]") and in the interrogation notes of Qais al-Khazali, Exhibit 38, at 282 ("The main security problem in Najaf is that the Iraqi army and the Iraqi police who are assigned to protect the area are all Badr Corps members. Their loyalty is with Iran . . . . [Y]ou cannot even get on the police force or be assigned there in the military if you don't

---

[9]     The U.S. currently has a small force in Iraq to aid the Iraqi government's fight against ISIS.

have a Badr connection."). However, State still redacted the following passage: "The provincial governor in Najaf, in a probable expansion of this trend, has inaugurated an ad-hoc 'special police force' composed primarily of Badr militia personnel" from the same cable. Exhibit 22, ¶ 7.

Finally, the intelligence sources and methods have likewise been official disclosed and become stale. For instance, the Department of Defense has released reams of data on sources and methods, such as the interrogation reports of Qais al-Khazali, discussed above, and the Redacted Detainee Reports publicly accessible from the Countering Terrorism Center at the United States Military Academy at West Point (https://ctc.usma.edu/harmony-program/). *See, e.g.*, Exhibit 32, at 1 ("The evidence is impressive. The five-page Qais Khazali sworn statement, made last week and marked with his inked fingerprints, is an unequivocal indictment of Iranian interference. His statement, along with those of his brother and other detainees . . . . are buttressed by dozens of documents taken from the captured laptops."). *See also* Exhibits 35-36, 39-40 (discussing intelligence sources and methods generally). Still, Plaintiff does not seek the names of any informants or intelligence methods that are still currently in use.

Taken together, the information in the cables—particularly the information of highest priority for Plaintiff—is not national security-sensitive and largely waived. For instance, State redacted the following passage:

> According to Talabani, IRGC Quds Force Commander Qassem Suleimani visited him in Syria to pass a message for the Ambassador. Suleimani told Talabani the U.S. and Iran have common interests in Iraq and are both working for success and security and against the terrorists; he said "I swear on the grave of Khomeini I haven't authorized a bullet against the U.S." He admitted to having hundreds of agents in Iraq at his disposal but denied ever using them against U.S. forces. He told Talabani he is ready to cooperate directly or indirectly through the Iraqi authorities. He said he wants the new Iraq strategy to be successful. He admitted that the Iranians captured in Erbil were members of [IRGC] but denied that they were Quds Force. He also admitted that they were targeting the British. Talabani admonished him to stop attacking the Brits, and Suleimani agreed to return to Iran to discuss it with Khamenei.

Exhibit 6, ¶ 9. A similar account from al-Maliki is redacted:

> Maliki said that he had presented "Iraqi evidence[] not U.S.-provided evidence" to Soleimani and Khamenei on Iranian training and equipping of the JAM Special Groups. Confessions by JAM personnel "and others," photos of weapons ("I told them labels said made in Iran, and other "Iraqi" information had all been laid out to the Iranian leader. Unlike on past occasions, Maliki said the Iranian response had not/not been denial. Soleimani had asserted that the training and weapons supply must have been done "without authorization" and would be investigated. The Supreme Leader had sworn "by every oath he knew" (Maliki said he attached no credibility whatsoever to all this) that he had issued a fatwa against any activities that could harm the security of Iraq. Therefore, he was shocked, shocked to learn that "someone must be violating my orders" and would investigate what had happened. He also undertook to talk to Moqtada[']al-Sadr about the activities of the Special Groups. Commenting on the relationship between Soleimani and Khamene[']i, Maliki said that it was a "mistake" to see Soleimani as an independent actor. "He follows Khamene[']i[']s line completely and without Khamene[']i he would be nothing."

Exhibit 23, ¶ 5.

There is no national security value in redacting Suleimani's preposterous lie about attacks on U.S. forces, or admissions to inserting "hundreds" of agents into Iraq, including the Erbil Five— these are matters of public record. Nor is there sense in protecting Talabani, who died in 2017 and, in this passage, takes the unremarkable position that IRC-QF must stop attacking Coalition Forces.

In another cable, State redacted the following:

> Rubai noted the contradiction and made it clear that Iran could do more. He said he personally pressed the following three points with Amini during their meeting: (1) the Iranians must stop the provision of EFPs to militants - the Americans are in Iraq at the request of the Iraqi Government so the Iranians are killing our friends and this, in turn, weakens the GoI; (2) Iranians should tell the JAM special groups under their control to stand down, just as Sadr has done with those groups under his control, and (3) The Iranians should stem the flow of small arms across the southern border to militia groups - the Iraqis know through years of experience that if Iran wants to control their borders they are capable of doing it. Amb. Ries hoped that the Prime Minister was still planning on receiving a briefing on Iranian nefarious activities in Iraq from Gen. McCrystal, just as Rubai had received.

Exhibit 10, at 6.

Again, the fact that Iran supplied EFPs and other arms to JAM special groups in Iraq is not only publicly known, it is the official position of the United States. Former NSA Rubaie's position that the U.S. was in Iraq on Iraq's invitation and that Iran must stop attacking U.S. forces, could not possibly be a position he holds only in secret. Even the fact that senior U.S. staff briefed Iraqis on the Iranian threat is well-documented—some of the briefing themselves have been released. *See* Exhibit 33.

State also redacted an explanation of EFPs—which has been officially disclosed in countless records and articles (and publicly available patents), along with the basics on the Sheibani network:

> Explosively-formed penetrator (EFP) charges, with a directed metal diaphragm that dynamically transforms upon detonation into an aerodynamic projectile traveling at 2000 meters per second, can punch through one side of an armored vehicle and out the other with catastrophic consequences to occupants inside. In recent months, this advanced Improvised Explosive Device (IED) technology has been identified in a growing number of deadly IED attacks against Coalition Forces throughout southern Iraq. The use of such devices appears to be expanding. Its introduction into the Iraq theatre of operations has been directly linked to the IRGC-backed network of Abu Mustafa al-Sheibani, a former IRGC-QF agent and Badr intelligence chief. In its cellular structure and operating methods, the network is reported to be modeled after Lebanese Hizballah, itself an organization historically known to be supported by the IRGC-QF. (COMMENT. EFP technology has been widely used by Hizballah and its Palestinian surrogates against the Israeli Army. END COMMENT.) According to a former member of the organization, Sheibani's organization receives training both in Iraq and Iran, and Lebanese Hizballah instructors, using excerpts from professionally developed Hizballah instructional videos, have taught detailed construction and placement techniques for EFP IEDs.

Exhibit 22, ¶ 12.

The information on EFPs and Hezbollah's use of them against Israelis is public knowledge. *See, e.g.*, Michael R. Gordon and Scott Shanemarch, U.S. Long Worried That Iran Supplied Arms in Iraq, N.Y. Times (March 27, 2007) (describing EFP design and their use by Hezbollah on Israeli forces), *available at* https://www.nytimes.com/2007/03/27/world/middleeast/27weapons.html.

The Sheibani network information was published by Treasury in its designation of Sheibani in 2008:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. . . . The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.
>
> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. . . . As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.
>
> Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. . . . Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.

Press Release, U.S Dep't of the Treasury, Treasury Designates Individuals, Entitiy Fueling Iraqi Insurgency (Jan. 9, 2008), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp759.aspx.

In yet another, State redacts the following:

> On January 7, the Ministerial Committee on National Security (MCNS) discussed the recent detention and subsequent release of Iranian "diplomats" involved in anti-Coalition and anti-[Government of Iraq] activity, agreeing that steps needed to be taken to discourage Tehran from engaging in further activities that undermine Iraqi sovereignty.

Exhibit 4, ¶ 1. Again, as shown above, the detention and release of IRGC agents posing as diplomats was the subject of official disclosure and frequent news coverage. In Exhibit 37, U.S. Central Command released interrogation notes from IRGC agents captured while posing as diplomats (including the infamous "Erbil Five"). Moreover, discouraging Tehran from undermining Iraqi sovereignty was *not* a position taken only in confidence.

Finally, State also withheld information from one cable pursuant to a statute language that State argues is incorporated through FOIA Exemption 3 and which "concerns intelligence sources and methods, and concerns the function of one or more of . . . the Defense Intelligence Agency, the National Reconnaissance Office, and the National Geospatial-Intelligence Agency." Declaration of Eric F. Stein in Support of State's Motion, ¶ 93. The WikiLeaks version of the cable includes citations to an unnamed Defense Intelligence Agency document but, again, nothing in the cable contains material that could reasonably cause serious harm to national security and that has not been otherwise disclosed (such as its discussion of EFPs and the designated al-Sheibani network).

## CONCLUSION

For the reasons set for above, the Court should grant Plaintiff's cross-motion for summary judgment and deny Defendant's motion for summary judgment.

DATED:     New York, New York
              November 20, 2018

Respectfully submitted,

**OSEN LLC**

By:  /s/ Michael J. Radine
       Michael J. Radine
       William A. Friedman
       1441 Broadway, Suite 6022
       New York, NY 10018
       Tel.: 212.354.0111

*Attorneys for Plaintiff*

22