UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

OSEN LLC,                                        :
                                                 :        Case No. 18-cv-6070-JSR
                          Plaintiff,             :
                                                 :
              -against-                          :
                                                 :
UNITED STATES DEPARTMENT OF STATE,               :
                                                 :
                          Defendant.             :

------------------------------------------------------------------x


**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT**



**OSEN LLC**

Michael J. Radine
William A. Friedman
1441 Broadway, Suite 6022
New York, NY 10018
Tel.: 212.354.0111

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

**Table of Authorities** ...................................................................................................................... ii

I.   State Inappropriately Relies on Cases Relating to the CIA ...................................................... 1

II.  State Misapplies the Official Disclosure Test from *Wilson*. ................................................... 2

III. State Misapprehends the Unofficial Disclosure Doctrine. ....................................................... 5

IV. Conclusion .............................................................................................................................. 10

## Table of Authorities

**Cases**

*Afshar v. Dep't of State*,
   702 F.2d 1125 (D.C. Cir. 1983) ................................................................................ 1

*Am. Civil Liberties Union v. Dep't of State*,
   878 F. Supp 2d 215 (D.D.C. 2012) ...................................................................... 4, 6

*Am. Civil Liberties Union v. Dep't of Justice*,
   894 F.3d 490 (2d Cir. 2018) ................................................................................... 3

*Am. Civil Liberties Union v. Dep't of Justice*,
   No. 15 CIV. 1954 (CM), 2016 WL 8259331 (S.D.N.Y. Aug. 8, 2016) ................... 3

*Florez v. CIA*,
   829 F.3d 178 (2d Cir. 2016) ................................................................................... 3

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ............................................................................ 1, 9

*N.Y. Times Co. v. CIA*,
   251 F. Supp. 3d 710 (S.D.N.Y. 2017) .................................................................... 3

*Phillippi v. CIA*,
   655 F.2d 1325 (D.C. Cir. 1981) .............................................................................. 9

*Whalen v. U.S. Marine Corps*,
   407 F. Supp. 2d 54 (D.D.C. 2005) .......................................................................... 1

*Wilson v. CIA*,
   586 F.3d 171 (2d Cir. 2009) ......................................................................... passim

**Other Authorities**

Executive Order 13526,
   75 Fed. Reg. 707 (Dec. 29, 2009) ...................................................................... 2, 9

Following the parties' initial round of briefs, Defendant U.S. Department of State ("State") "re-released 15 documents to Plaintiff, with additional information unredacted." Second Declaration of Eric F. Stein, ECF No. 22, ¶ 19.  Plaintiff appreciates State's recognition that some of the redactions were unnecessary and internally inconsistent. *Id.* However, its other overzealous redactions remain, which Plaintiff continues to contest. Its opposition and reply brief ("State Opp.") does not improve its argument—it (1) misconstrues CIA-related case law to mean that a requestor can only challenge a claimed FOIA exemption with official disclosures made by the same agency and (2) that unofficial disclosures can never diminish the claimed "damage" to national security that the agency must show official disclosures would cause.

## I.      State Inappropriately Relies on Cases Relating to the CIA.

Much of State's argument relies on FOIA cases involving the CIA—most prominently *Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009)—but, as courts in this and the D.C. Circuit have explained, the CIA operates under a different legal framework for FOIA issues. The CIA employs its own secrecy statute that requires near total deference from courts:

> Indeed, the Court recognizes that the "broad sweep" of § 403-3, "comports with the nature of the [CIA's] unique responsibilities," *Sims,* 471 U.S. at 169, 105 S.Ct. 1881. Further, "the legislative history of [§ 403-3] also makes clear that Congress intended to give the [Director of Central Intelligence] broad authority to protect the secrecy and integrity of the intelligence process." *Id.* at 170, 105 S.Ct. 1881. The "sources and methods" exemption is a "near-blanket FOIA exemption," and is "only a short step [from] exempting all CIA records from FOIA." *Minier v. CIA,* 88 F.3d 796, 801 (9th Cir.1996).

*Whalen v. U.S. Marine Corps*, 407 F. Supp. 2d 54, 59 (D.D.C. 2005) (alterations in original).[1] *See also Larson v. Dep't of State*, 565 F.3d 857, 863 (D.C. Cir. 2009) (upholding the CIA's Exemption

---

[1]      Even cases cited in *Wilson* and by State with State in the title in fact reference portions relating to the CIA. *See, e.g.*, *Afshar v. Dep't of State*, 702 F.2d 1125, 1130–31 (D.C. Cir. 1983) (discussing withholdings by the CIA); *Larson v. Dep't of State*, 565 F.3d 857, 863 (D.C. Cir. 2009) ("Even seemingly trivial details may be of great significance to foreign intelligence services with a broad view of the intelligence landscape in their attempts to discover and thwart *CIA* intelligence-gathering methods.") (emphasis added).

1 withholdings as "[t]he Supreme Court has acknowledged the paramount importance of protecting intelligence sources for precisely the reasons detailed by the CIA"). Not only is State not the CIA, *State has only invoked the "sources and methods" exemption* (Executive Order 13526 § 1.4(c), 75 Fed. Reg. 707, 709 (Dec. 29, 2009)) *for one cable. See* Exhibit 22 of the First Declaration of Michael Radine, ECF No. 20.[2] Using these stricter cases—to borrow State's term—"infects" each of its arguments. *See* State Opp. at 14.

## II.    State Misapplies the Official Disclosure Test from *Wilson*.

The official disclosure test states that FOIA exemptions are waived by information that (1) is "as specific as" and (2) "matches" the withheld information and (3) is "made public through an official . . . disclosure." *Wilson*, 586 F.3d at 186. In the CIA context, however, that official disclosure *must also be made by the CIA*. As an S.D.N.Y. court explained, this principle is limited to the CIA context:

> I do not read *Wilson* to require that the withheld information correspond verbatim to information previously released, or that the prior release have been made by the very official whose statement appears in the withheld document, or by an official in the agency where the discloser works, or even by an official in the branch of Government where the discloser works. The Government is the Government; and if, for example, the Attorney General makes a factual assertion about the Defense Department, then that fact has been "officially acknowledged" by the Government for purposes of the *Wilson* rule—but only to the extent of the specificity of the public statement.
>
> There is but one exception to the preceding sentence; as already noted, the "law will not infer official disclosure of information classified by the CIA from ... release of information by another agency, or ever by Congress," *Wilson*, 586 F.3d at 186-87. That, too, is the "law of this Circuit."

---

[2]      Plaintiff addresses this cable in its opening memo, at 22. The redactions are difficult to address because State simply lumped its classifications under 1.4(b), (c) and (d) together as "B1," and provided no elaboration in its declarations. It is likewise unclear who or what the "sources or methods" are, or why they cannot be more narrowly redacted.

*Am. Civil Liberties Union v. Dep't of Justice*, No. 15 CIV. 1954 (CM), 2016 WL 8259331, at \*4 (S.D.N.Y. Aug. 8, 2016), *vacated*, 894 F.3d 490 (2d Cir. 2018).

In vacating the decision on other grounds, the Second Circuit specifically declined to reverse this holding (or even its application to "a certain fact," which it only called "reasonably debatable"). 894 F.3d at 494-95. However, State elides this distinction in repeatedly stating that "[t]he Second Circuit has held that the statements of one department or branch of the government do not constitute an official acknowledgment by another." State Opp. at 7 (citing *Wilson*). *See also Florez v. CIA*, 829 F.3d 178, 186, 187 & n.9 (2d Cir. 2016) (declining to "suggest that FBI Disclosures *necessarily* preclude the CIA's right to assert a *Glomar* response" because of CIA-related case law relating to *Glomar* responses, but noting exceptions to that rule as well) (emphasis added).

Finally, even if the same-agency doctrine applied to State, disclosures from the Department of Defense ("DoD") are still relevant for evaluating whether an agency's invocation of FOIA Exemptions 1 and 3 are "logical and plausible": "It defies reason to instruct a district court to deliberately bury its head in the sand to relevant and contradictory record evidence solely because that evidence does not come from the very same agency seeking to assert a *Glomar* response in order to avoid the strictures of FOIA." *Id.* at 187. State only considered DoD disclosures under the *Wilson* official disclosure test, despite citing *Florez* elsewhere. Likewise, this Court has held that the CIA's "puzzling refusal to acknowledge . . . the clear import of *Florez* . . . , which held that disclosures by one agency are relevant to the sufficiency of another agency's *Glomar* response, calls into question the reasonableness of the CIA's approach." *N.Y. Times Co. v. CIA*, 251 F. Supp. 3d 710, 714 (S.D.N.Y. 2017) (Rakoff, J.). The logic and plausibility of State's invocation of Exemptions 1 and 3 are likewise challenged by DoD and other public disclosures.

3

State also argues that if the DoD disclosures *were* somehow official disclosures, Plaintiff only provided "generalized" examples of matching information from official disclosures. State Opp. at 9. This imports the *Wilson* test for waiver-by-official disclosures, rather than the *Florez* "contrary evidence" test—but it also ignores Plaintiff's specific examples, such as the redacted language relating to the Iranian-sponsored Badr Corps' involvement in the Najaf police force. Pls. Mem. at 17-18. Other examples abound—for instance, former MNF-I commander General David Petraeus' unclassified testimony before Congress that "Ambassador Crocker has assessed that Iran has sought to 'Lebanonize' Iraq, and there are many indicators that support that assessment," *see* Exhibit 1 of the Second Declaration of Michael J. Radine, at 162, closely matches language the State Department has redacted concerning a meeting with the same Ambassador Crocker: "Iran would manipulate the crisis to 'Lebanize' southern Iraq," Exhibit 25 to the First Radine Declaration (Nov. 20, 2018), ECF No. 20, ¶ 4 (redacted). But the point is that the volume of official disclosures about the U.S. presence in Iraq (which ended 7 years ago) is a staggering amount that cannot be dismissed as a matter of law—at the very least, it raises questions of genuinely disputed material fact.

State's errors are clear in its misapplication of a D.C. district court opinion, *Am. Civil Liberties Union v. Dep't of State*, 878 F. Supp. 2d 215 (D.D.C. 2012).[3] In that case, the ACLU argued that State officials' generalized statements about the WikiLeaks releases "acknowledged" them, making them official disclosures. The court disagreed, holding that the ACLU "failed to tether those generalized and sweeping comments to the specific information at issue . . . ." *Id.* at 224. However, that case was decided before the 2013 Chelsea Manning court martial; the United States' submissions in that case—principally the Information Review Task Force's

---

[3]     Notably, State objects to Plaintiff's citation to a D.C. district court opinion, *Wash. Post v. Dep't of Defense*, 766 F. Supp. 1 (D.D.C. 1991), as out-of-circuit, *see* State Opp. at 14 n.5.

"comprehensive" review on the disclosure of State (and other) records on Wikileaks—do officially acknowledge the cables at issue. *See* Pls. Mem. at 9-10; Exhibit 29 ("IRTF Report") of the First Radine Declaration.

State argues that the IRTF Report is "not specific to the documents plaintiff offers here" and that the report, issued by the DoD, "fails to demonstrate the *State Department's* official acknowledgement of anything." State Opp. at 6. State is wrong on both counts: (1) The IRTF report is, by its terms, a "*line-by-line*" review of *all* of the State cables on WikiLeaks, not a generalized statement about WikiLeaks—and State has not propounded evidence suggesting otherwise—and (2) while the same-agency doctrine applies only to the CIA, State officials *were* part of the Information Review Task Force that published the IRTF Report. *See* IRTF Report at 9 ("The IRTF brought together representatives from over 20 agencies," including, in the figure on that page, State).

## III.  State Misapprehends the Unofficial Disclosure Doctrine.

Plaintiff argued in its motion for summary judgment that State cannot demonstrate substantial harm to national security from disclosing information (which, again, was largely declassified and related to stale issues) already published by WikiLeaks. Although State declines to "comment" on the authenticity of the WikiLeaks cables, State Opp. at 5 n.2, 5 n.3, 12 (calling them "unauthenticated" without elaboration), State does not dispute any of Plaintiff's evidence showing that the WikiLeaks versions of the cables are authentic.[4] State does not dispute that the unredacted language is identical to the WikiLeaks counterparts, or that it is extremely unlikely that the counterparts to the redacted language were somehow manipulated. State does not dispute that

---

[4]     The WikiLeaks material thus resemble the evidence in *Wilson* which "appears more reliable as evidence of Ms. Wilson's prior CIA affiliation than the sort of 'public speculation' generally dismissed in the case law." *Wilson*, 586 F.3d 171, 195 (2d Cir. 2009) (quoting *Afshar v. Dep't of State,* 702 F.2d at 1131)).

the data was transferred from the State database to the WikiLeaks database by a "'process or system' that generally 'produces an accurate result.'" Pls. Mem. at 11 (quoting Fed. R. Evid. 901(9)). State does not dispute that the IRTF performed a "line-by-line review of every [State] report" and confirmed that they were "derived from the [State] database." *Id.* State does point out that the IRTF Report was issued by the DoD (omitting their own involvement), but that fact relates to waiver (and even then, only for the CIA), *not* authentication.

State also does not dispute that its justification for much of its withholding—that disclosing conversations with one foreign politician could make other politicians feel less comfortable talking to American officials—is a basis so sweeping that it has no limiting principle. State does not explain how its disclosure of countless off-the-record conversations with foreign officials (including in the cables at issue) does *not* have that effect (or how withholding a conversation with a since-deceased politician like Jalal Talabani is grounds for withholding that or any other conversation), or why politicians' names cannot be redacted. State does not counter any of the examples of officially disclosed information Plaintiff cited, waving them off as "generalized."

Instead, State again turns to CIA case law (*Am. Civil Liberties Union v. Dep't of State* does not address the issue). First, State appears to read *Wilson* to mean that unofficial disclosures cannot, as a matter of law, require an agency to disclose similar information. *See, e.g.*, State Opp. at 4 ("The Purported WikiLeaks Documents Fail the *Wilson* Test"); *id.* at 7 ("[W]hether or not genuine copies of that information have been unofficially made available through illicit means is irrelevant to the *Wilson* inquiry."). But the "*Wilson* test" is a *waiver* test for *officially* disclosed information. In a separate discussion, the *Wilson* court briefly considered whether unofficially disclosed information could sufficiently diminish the harms raised by the CIA relating to its unique responsibilities in protecting "sources and methods" of intelligence.

In *Wilson*, the CIA had forbidden Valerie Plame Wilson from publishing certain passages in her memoir relating to the pre-2002 portion of her career in the CIA, deeming them "highly classified." *Wilson*, 586 F.3d at 176. Ms. Wilson then published a CIA letter confirming her pre-2002 service. The court held that the publication of the letter was not an "official disclosure" "as it was Ms. Wilson, and not the Agency, that permitted the information at issue to be revealed to the public." *Id.* at 174. The court then held that she could not publish information *she herself released* because she "signed a contract forever waiving her right to 'disclose in any form or in any manner'" the relevant information, with no "exception permitting her to discuss information that remains classified *provided that little or no harm would result*." *Id.* at 192 (emphasis added). Thus, the issue was *not* whether "the harms described would be likely to result from the publication of Ms. Wilson's book," because "Ms. Wilson is not entitled to the benefit of public disclosure of a document, the February 10 Letter, for which she is herself responsible." *Id.* at 194 n.26.

Whether a CIA employee is contractually barred from releasing even harmless information is irrelevant to the FOIA question at hand, as the *Wilson* court noted:

> The fact that others, not subject to such a secrecy obligation, are free to investigate Ms. Wilson's past and to compile and discuss all available information regarding her career-including the February 10 Letter-is not, as plaintiffs insist, an absurd or anomalous result. The law has long distinguished between "strangers," who "may republish previously published material," and former intelligence agents, who "are bound by formal agreements not to disclose [classified] information." As noted, when Ms. Wilson elected to serve with the CIA, she accepted a life-long restriction on her ability to disclose classified and classifiable information. That Ms. Wilson's service may have been cut short by the failure of others to respect the classified status of her employment may well have warranted investigation. But these circumstances do not absolve Ms. Wilson of her own secrecy obligations.

*Id.* at 196 (quoting *Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362, 1370 (4th Cir. 1975)). Plaintiff here is not bound by an agreement with State, nor is State seeking to prohibit Plaintiff from discussing the information in its work on behalf of injured U.S. veterans and their family members.

7

Although noting the issue was not effectively briefed by the parties, *id.* at 191, 192, the court did briefly consider whether any harm would result from Ms. Wilson's discussion of information that had "not been officially disclosed and remain[ed] properly classified, because identical information is already in the public domain . . . ." *Id.* at 192. The court found that Ms. Wilson's identification of those dates would mean that "any discussion of her activities after that date, whether by Ms. Wilson or others, would necessarily reveal CIA 'sources and methods,' information that lies at 'the heart of all intelligence operations.'" *Id.* (quoting *Sims,* 471 U.S. at 167). As explained above, the CIA's protection of intelligence sources and methods receives a degree of deference not due to, *e.g.*, State, and State's redactions here are not to protect "sources and methods" (with one exception discussed above).[5]

Finally, given the "highly classified" nature of the information in question, *id.* at 176, the *Wilson* court "decline[d] to discount the importance of such 'lingering doubts' to maintaining the secrecy of CIA sources and methods relating to unconfirmed periods of Ms. Wilson's Agency service, and to preserving the options of deniability and professed ignorance that remain important niceties of international relations." *Id.* at 195. This holding, however, is premised on the intensive secrecy issues resident with the CIA. *See id.* at 186 (noting that disclosure of clandestine CIA activities could be embarrassing to a foreign power). The *Wilson* court explained that "the Supreme Court has recognized the *CIA's authority* to preclude disclosure of even 'superficially innocuous information' when it might *facilitate the discovery of more sensitive matters.*" *Id.* at 193-94 (quoting *Sims*, 471 U.S. at 178) (emphasis added).

---

[5]     Plaintiff here does not dispute the *Wilson* court's note that, under the operative executive order, classified information is not "declassified *automatically* as a result of any unauthorized disclosure of identical or similar information." *Id.* at 194 (quoting 68 Fed. Reg. at 15,315) (emphasis added) (the language in the current executive order is at 75 Fed. Reg. 707, 707). While the information here is automatically declassified by other means, this argument relates to whether disclosure will cause any harm given other, unofficial disclosures.

As Plaintiff has explained above and in its prior brief, the importance of deniability is much higher in relation to the unique duties of the CIA. Indeed, the cases cited by *Wilson* make this clear. *See, e.g.*, *id.* at 195 ("recognizing government's 'compelling interest in protecting . . . the appearance of confidentiality so essential to the effective operation of our *foreign intelligence service*'") (emphasis added) (quoting *Snepp v. United States*, 444 U.S. 507, 510 n.3 (1980) (referencing the CIA)). *See also id.* (citing *Afshar v. Dep't of State*, 702 F.2d 1125, 1130–31 (D.C. Cir. 1983) ("Unofficial leaks and public surmise can often be ignored by foreign governments that might perceive themselves to be harmed by disclosure of their cooperation *with the CIA*, but official acknowledgment may force a government to retaliate.") (emphasis added); *Larson v. Dep't of State,* 565 F.3d 857, 863 (D.C. Cir. 2009) (recognizing that "seemingly trivial details may be of great significance to foreign intelligence services with a broad view of the intelligence landscape in their attempts to discover and thwart *CIA* intelligence-gathering methods") (emphasis added); *Phillippi v. CIA,* 655 F.2d 1325, 1331 (D.C. Cir. 1981). State has provided no specific instances where the equivalent is true of the cables it withheld.

Thus, the phrase "niceties of international relations" should not be read to mean that *any* concern relating to diplomatic decorum automatically could be "reasonably . . . expected to cause serious damage to the national security" E.O. 13526 § 1.2(a)(2). As Plaintiff previously explained, the issues raised by CIA disclosures are a far cry from diplomatic cables at issue here that largely relate to decade-old diplomatic conversations, not intelligence sources or methods. Here, "niceties" redacted by State include complimentary small talk shared between former Iraqi Prime Minister Maliki and former MNF-I commander Raymond Odierno. Pls. Mem. at 16 n.7. In another example, State redacted an account of a 2009 incident in which a U.S. forces unit asked an Iraqi Army unit to take down an "old Iraqi flag" and cover some pro-Saddam graffiti (news which

9

*appropriately* "upset" Maliki). State not only redacted this seemingly inconsequential event, it marked it for declassification in *2029*, 20 years after it occurred. Exhibit 7 of the First Radine Declaration, ¶ 11.

Further (although State does not mention it), this was not the end of the *Wilson* court's analysis—"the question remains, of course, whether they have done so here with the 'specificity' necessary to confirm the rationality of their decision. In short, does the Agency have good reason to conclude that full disclosure of Ms. Wilson's employment history reasonably could be expected to result in damage to the national security.'" *Id.* at 195 (citations omitted). The court reviewed the classified material and determined that, for the reasons discussed above, the disclosure "would facilitate the identification of particular intelligence sources and methods, thereby compromising the Agency's ability to use such sources and methods in the future." *Id.* at 196. Given the many disclosures made by State, other government agencies including the DoD, news media, and WikiLeaks, State has not made such a showing here.

**IV.    Conclusion**

State has quoted from Judge Katzmann's concurring opinion in *Wilson*, but another passage from that opinion provides a more relevant appraisal of State's argument: "Senator Daniel Patrick Moynihan, a student of secrecy, believed that the obvious need to protect legitimate secrets is undermined when agencies proceed reflexively without a fully reasoned assessment of the likely consequences of positions contemplated." 586 F.3d at 201 (Katzmann, J.). State has reflexively redacted large amounts of previously declassified information—regularly disclosed by the U.S. government—on often innocuous or otherwise stale topics relating to a conflict that concluded nearly a decade ago, *all* of which is readily available *verbatim* online. For the reasons stated above, the Court should grant Plaintiff's cross-motion for summary judgment and deny State's motion for summary judgment.

DATED:      New York, New York
            December 10, 2018

Respectfully submitted,

**OSEN LLC**

By:  /s/ Michael J. Radine
     Michael J. Radine
     William A. Friedman
     1441 Broadway, Suite 6022
     New York, NY 10018
     Tel.: 212.354.0111

*Attorneys for Plaintiff*