Ich9oseo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

OSEN LLC,

                    Plaintiff,

          v.                          18 CV 6070 (JSR)

UNITED STATES DEPARTMENT OF
STATE,

                    Defendant.

------------------------------x
                                      New York, N.Y.
                                      December 17, 2018
                                      3:14 p.m.

Before:

                    HON. JED S. RAKOFF

                                           District Judge

                         APPEARANCES

OSEN LLP
     Attorneys for Plaintiff
BY:  MICHAEL J. RADINE
     WILLIAM FRIEDMAN

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
     Civil Division
PETER ARONOFF
     Assistant United States Attorney

Ich9oseo

1        (Case called)

2            MR. RADINE:  Michael Radine for plaintiff.

3            MR. FRIEDMAN:  William Friedman for plaintiff Osen

4    LLC.  Good afternoon, your Honor.

5            MR. ARONOFF:  Peter Aronoff U.S. Attorney's Office of

6    the Southern District of New York.

7            THE COURT:  So we're here on the oral argument on

8    crossmotions for summary judgment.  So there is no magic in who

9    goes first but let me hear from plaintiffs first.

10            MR. RADINE:  Sure.  Thank you, your Honor.

11            As we see it, there are two issues here going to

12    whether there's contrary evidence to the State Department's

13    grounds for withholding its information.  There is whether

14    State has specifically identified what harms will flow from

15    disclosing information that's already available publicly and

16    whether State has specifically identified harms flowing from

17    what it's withheld versus what other official disclosures are

18    out there from State itself from other agencies.

19            In both these cases State's argument largely relies on

20    case law involving either the CIA or in light of the CIA on

21    issues about intelligence sources and methods, which is a

22    ground for withholding information under the executive order at

23    issue here.

24            However, of course, State is not the CIA and there's

25    only one cable at issue for which it uses the intelligence

Ich9oseo

1    sources and methods ground for withholding.  We dispute that as

2    well but make the larger point that this case law is inapposite

3    to the rest of the withholdings.

4            On the unofficial disclosure ground, here of course I

5    mean WikiLeaks, as to those documents there's case law that

6    says that the CIA intelligence sources and methods are so

7    valuable and so important, they have such a capacity to

8    embarrass a foreign nation that allowed a CIA operation, for

9    instance, to occur on its soil that the remainder of doubt that

10   a source might not be, the unofficially disclosed source, might

11   not be genuine is worth keeping.  It's not an issue here.

12           First of all, the materials from WikiLeaks don't

13   present the same issues of doubt as they might in other cases.

14   So, for instance, in the Second Circuit case Wilson v. CIA the

15   issue was whether Ms. Wilson's letter from CIA HR about her

16   employment dates.  She had gotten that letter from the CIA and

17   she disclosed it in breach of her own employment agreement.

18   The Court said there's still some question of doubt as to

19   whether the CIA's HR department correctly provided her dates of

20   employment.

21           It's not an issue here.  The question is not whether

22   the information in the cables is accurate.  The question is

23   whether the WikiLeaks versions of the cables are accurate.

24           We provided authentication evidence that State has not

25   countered.  And in the years since the WikiLeaks disclosure has

Ich9oseo

1    been made, there has not been, to our knowledge, or that State

2    has raised, any evidence that they're inaccurate in any way.

3    Presumably the government would like to discredit that

4    disclosure.  It has yet to happen.

5           On the official disclosure ground State relies on case

6    law suggesting that --

7           THE COURT:  If there had been no WikiLeaks disclosure,

8    are you saying that they could not on other grounds withhold

9    the remaining portions of these documents that are still in

10   controversy.

11          MR. RADINE:  If the WikiLeaks disclosure had never

12   happened, they'd still have to confront official disclosures

13   paid both by themselves, including in these cables and in -- by

14   other agencies.

15          A couple of comments on that.  Within these cables I

16   would point to a few examples which really bring to question

17   their ground that they can't disclose frank conversations with

18   foreign officials.  As we mention in our briefs, we think, as a

19   general ground, protecting all conversations with foreign

20   officials seems boundless and seems contrary to the FOIA

21   purpose of disclosure.  But if your Honor has it in front of

22   him, I would turn to, for instance, Exhibit 19 from us which is

23   the -- it's a cable, subject line:  Iran Managing the

24   Post-Basrah Backlash.

25          THE COURT:  Hang on a minute.

5

Ich9oseo

1           Go ahead.

2           MR. RADINE:  So it's easier to read on the WikiLeaks

3     version, which starts a few pages in.  And what's clear in

4     paragraphs 1 through 4 is a conversation that is happening

5     between -- it's as near as I can tell a private conversation

6     that's happening between State Department officials and Iraqi

7     officials.

8           Paragraphs three and four are not redacted, even

9     though it goes into detail about Iranian meddling in the

10    national security of Iraq.

11          The next few paragraphs are redacted.  They seem to

12    touch on the same subjects.  It's not clear why.  There are

13    names, it's true, of interlocutors after paragraphs three and

14    four.  But we'd submit those could just be redacted.

15          To the extent that the purpose behind FOIA is

16    disclosing all segregable information, then redacting just

17    those names would seem to solve their problem.

18          And even --

19          THE COURT:  So what is the ultimate reason why you

20    need these disclosures from the government?  The normal FOIA

21    rationale is simply to evaluate whether the government is

22    working the way it's supposed to.  And here you have the actual

23    remainder of the documents but you say that's not good enough.

24    You need more than just that information.  You need an absolute

25    in effect confirmation from the government that, yes, this was

6

Ich9oseo

the document.  And for what purpose?

MR. RADINE:  Well, we use these documents in the civil suits that we bring on behalf of our clients.  And although we believe that, for the same reasons provided in our briefs, the WikiLeaks versions are authenticatable, the stronger evidence will always be the evidence from State Department itself and it may carry more weight.

THE COURT:  Has that come up in any of your cases?

MR. RADINE:  We have so far attempted not to use this information.  Fortunately, there is so much officially disclosed information about that time period that we haven't needed to.  In the exhibits in our crossmotion we provided really a very small sample, four of the weekly summaries from the commander of MNF-I that's Multinational Forces Iraq, that was General David Petraeus, and then later Raymond Odierno to Secretary of Defense and other information that's been provided by Sencom.

I would note that that information from those agencies is not only on the same topic and covers the same material but that's from another agency that not only has responsibility for national security, but one of the figures who is frequently redacted is the MNF-I commander himself, but he's a Department of Defense employee.  To the extent that Department of Defense understands what presents a national security issue, I think it should apply here as well.  This is, as opposed to some of the

Ich9oseo

1    cases that raise a question as to whether another agency can

2    officially disclose information for a withholding agency, first

3    of all, these are generally all CIA cases, as Judge McMahon's

4    opinion in ACLU points out, but also those tend to be cases

5    where the other agency doesn't have a national security role.

6    So in Frugone v. CIA the CIA withholds information about

7    Frugone's employment, same thing as in Wilson v. CIA, and the

8    other agency disclosing it is the Office of Personnel

9    Management.  Naturally, the Office of Personnel Management

10   doesn't have that role, a national security role.

11           In the case that gave us Glomar, the Glomar response,

12   the CIA is withholding information as to the Glomar ship and

13   the disclosing agency was the National Science Foundation.

14   It's not at all similar to the situation here where State is

15   withholding information that the Department of Defense is

16   disclosing, including in some cases the same conversations.  We

17   have the example in the reply brief about Iran attempting to

18   Lebanize Iraq.  I would suspect that is literally the same

19   conversation that was redacted from the State version of that

20   cable.

21           So, in short, we have a hard time understanding the

22   justifications.  The State Department has attempted to take the

23   CIA's justification, that sort of last shred of deniability

24   that's so important when it comes to maintaining secrecy around

25   a CIA operation and a foreign country, and extend that broadly

Ich9oseo

```
 1    to any conversation that a State Department official might have
 2    with a foreign official.
 3            They don't cite a case for this proposition because
 4    it's too broad.  It would essentially raise these
 5    conversations, some of which, I point out, are really not very
 6    extraordinary such as Prime Minister Maliki and Raymond
 7    Odierno, general U.S. forces complimenting each other and
 8    welcoming each other to a meeting, and raise that to the level
 9    that the CIA enjoys.  It is cross-purposes to FOIA and
10    unjustified by the case law.
11            With that, I think we'd take any questions from your
12    Honor.  But I think that our briefs cover our concern.
13            THE COURT:  I'll put you on hold for now.  Let me hear
14    from your adversary.  We'll come back to you very shortly.
15            MR. ARONOFF:  Thank you, your Honor.
16            In large part I think that plaintiff's argument here
17    just takes these documents at a level of generality that does
18    not recognize the particular national security harms that the
19    government has identified.  The general issue with plaintiff's
20    characterization of the documents -- and this is setting aside
21    for the moment the question of whether the information that's
22    withheld is the same as the information that's available on
23    WikiLeaks, on that point I note that the State Department has
24    in this case, and has since the WikiLeaks disclosures first
25    began, always refused to authenticate or comment on any
```

Ich9oseo

specific document.  But even assuming for the sake of argument

that the information that's withheld is the same, plaintiff

appears to be saying that information about diplomacy for

foreign affairs does not deserve protection in the same way

that intelligence information deserves protection.  That

argument finds no basis in case law.  It doesn't find any basis

in the executive order governing classification.  In fact,

Executive Order 13526 Section 1.4 specifically lays out both

foreign government information and information relevant to the

conduct of foreign relations on an equal footing with

intelligence sources or methods.  So I see no basis to say

categorically that the State Department's conduct of foreign

affairs is somehow less important to national security than the

defense department's role, a separate role in representing the

United States abroad.

        Plaintiff also claims, particularly in the reply

brief, that somehow the CIA is different.  This is another

version of the same argument.  And it is true that there's a

lot of case law about the CIA and FOIA, but that's not -- when

we're talking about Exemption One, it's not because the CIA

enjoys some special status.  As I mentioned, the executive

order puts intelligence sources and methods on the same footing

as other bases for classification.

        Plaintiff's citations are about Exemption Three and

it's true that the CIA does enjoy some particular applicability

Ich9oseo

1    to protect certain kinds of information under Exemption Three

2    but that's not relevant to this case.

3         THE COURT:  So if we look at Exhibit 19 which was the

4    one that your adversary pointed to.  What exemption applies to

5    the redacted portions that does not apply to the unredacted

6    portions?

7         MR. ARONOFF:  Well, the redacted portions of

8    exemption -- sorry, of Exhibit 19 are withheld under Exemption

9    One.  They're classified -- broadly, that this document has

10   classification both because it contains foreign government

11   information, it would be in the margin, the government document

12   1.4(b) referring to the executive order.  At 1.4(d) that's

13   information relevant to the conduct of foreign relations.

14        To get to your Honor's question, compared to the rest

15   of the document the State Department did a line-by-line review

16   of each of these documents when it received this FOIA request.

17   The information that was released, in the State Department's

18   view, releasing it would not cause any harm to national

19   security and typically -- I mean we're speaking about a number

20   of documents and each document is reasonably long, but

21   typically the reason is that information still withheld at this

22   point relates to particular conversations with foreign

23   officials, usually high-ranking officials, about sensitive

24   matters in Iraq.  Many of these officials are still active in

25   politics in Iraq today.  And releasing them -- it's just like

1  politics in the U.S.  It's important to conduct certain kinds

2  of activities in a sensitive and discrete way and if a

3  behind-the-scenes look at exactly everything that a foreign

4  official said to the United States and an American official's

5  characterization or reaction to that specific conversation, if

6  that came out, that would damage the United States' ability not

7  only to deal with the specific individuals involved but also

8  the United States is a repeat diplomatic player and on an

9  ongoing basis if the United States is forced to give official

10  accounts of all of its conversations that it holds with foreign

11  officials across the world, it would make it impossible to

12  conduct the sort of sensitive discussions that are necessary

13  for diplomacy in foreign affairs.

14       THE COURT:  Why wouldn't the concerns that you're

15  raising with respect, again just focusing on these particular

16  paragraphs of 19, be satisfied by just redacting the names of

17  the people who are the sources?

18       MR. ARONOFF:  As a general matter, this goes more to

19  segregability than to classification.  There's a few different

20  reasons.

21       One reason is, particularly in the area of

22  classification, courts have recognized that individual details,

23  none of which are significant on their own, when taken together

24  can rise to the level of a sensitive piece of information.  And

25  so having some details about a conversation, even if the

Ich9oseo

1   speaker himself or herself is not identified or neither side is

2   identified, it may still allow for an inference for who was

3   speaking based on context and the context of the surrounding

4   document.

5          It's also possible that it doesn't matter who was

6   speaking, it just matters that someone high ranking in Iraqi

7   government said this to someone at the U.S. Embassy or

8   otherwise in American government.

9          These are general reasons but these are the sorts of

10  reasons that the State Department considers.

11         And I would note also that the redactions here are

12  really at the sentence-by-sentence level.  The State Department

13  was careful to enclose disclose exactly as much information as

14  it could and still protect national security.

15         And I also note that a lot of information was

16  classified specifically during the review for this very case.

17  So it's not the case that the State Department simply kept the

18  classified labels that were first put in place ten years ago or

19  whenever these documents were created.  There really was a

20  line-by-line review of each sentence.

21         THE COURT:  Let's go back, finally, to plaintiff's

22  counsel.

23         MR. RADINE:  A few comments on defendant's argument.

24  The distinctions in Exhibit 19 that really provide a good

25  example, because the argument that there are individual pieces

Ich9oseo

1    of information that can be read in the aggregate is an argument

2    that's -- I believe I've only seen, again, in the intelligence

3    context.   This is Larson v. State which says in the context of

4    the CIA that even trivial pieces of information can be brought

5    together by enemy intelligence services trying to work out the

6    methods of the CIA.   I haven't seen it used in this diplomatic

7    context.

8            But more to the point, these propositions that there

9    could be individual pieces or maybe it's not the name but you

10   can figure out who it is, these are all points that have to be

11   made in a declaration.   They have to be made with enough

12   specificity that the Court can review that and the opposing

13   party can try to counter them.   As a sort of post hoc

14   explanation, it's not helpful.

15           As near as we can tell from the declaration, the

16   ground for withholding cable after cable is a fact that it

17   would reveal who the speaker was who, as I said, may be still

18   in politics; although I'll note that's not always the case.

19   And at least in the case of President Talabani he is not even

20   alive.   So I don't think that that works as a justification, at

21   least as the way the declaration is spelled out.

22           Again withholding it as information is not the issue.

23   The information is available on WikiLeaks.   The question then

24   is whether the official disclosure of that information has an

25   additional threat to national security.   And as the case law

Ich9oseo

1   shows, that appears in the CIA context.  It may appear for

2   other agencies that enjoy that additional level the DIA, the

3   NSA possibly.  But it's not appeared in the context of simple

4   diplomatic chatter.  It's appeared in that sources and methods

5   environment.  Again, that's appeared, the sources and methods

6   is at issue in one cable.  We would dispute that as we laid out

7   in our brief.  But it's just there.

8          So, given the purpose of FOIA as a disclosure statute,

9   even crediting the idea that some of these conversations have

10   names that you're withholding, although they're not always

11   withheld.  Truly you can just jump to the very first exhibit to

12   find a conversation here.  There are some redactions.  But you

13   know who is in the conversation.  It's literally in paragraph

14   one, this document's subject line is:  Charge's July 29 meeting

15   with NSA Rubaie.  That's Chargé D'Affaires Patricia obtained

16   this meeting with Iraqi National Security Adviser Mowaffak

17   al-Rubaie.  It says in a July 29 introductory call, National

18   Security Adviser Rubaie told Chargé Butenis –– it goes on from

19   there.  Parts of it are exempted.  Parts of it are not.  It's

20   not something based on a declaration that we can follow and,

21   therefore, it's not something we can easily respond to.

22          THE COURT:  All right.  I'll hear finally from the

23   government.

24          MR. ARONOFF:  Thank you, your Honor.

25          As an initial matter, the government submitted two

Ich9oseo

1    unclassified declarations.  Necessarily, when discussing

2    classified information, an unclassified declaration must be

3    circumspect.

4              THE COURT:  That reminds me.  Although I can pretty

5    well tell what's been redacted and what hasn't, since there was

6    some further disclosures after the initial documents were given

7    the Court, it would be helpful to have in some form what those

8    additional disclosures were so that I can evaluate exactly

9    what's being still redacted and what isn't.  So if maybe

10   jointly you could figure out a nice way to -- worst case you

11   can give me the new versions of what has been disclosed and I

12   can compare them with the WikiLeaks documents.  But I'm open to

13   any other way you want to do it.  I just want to be able to

14   know for sure -- I don't want to spend time looking at

15   something that turns out to have already been disclosed in the

16   second round of disclosures.

17             MR. ARONOFF:  Very well, your Honor.

18             I do note of course that the government is not

19   confirming that the information in WikiLeaks versions --

20             THE COURT:  Yes, of course.  And that's an important

21   part of your argument.  I understand that.  And I think -- this

22   has been implicit in much of the briefing, is so someone hacks

23   into secret materials.  The government -- they then become

24   public in some sense but, of course, the public is free to use

25   them in that sense.  The government then is sort of in the

Ich9oseo

horns of a dilemma.  They want to reveal there's been a leak or

a hacking but they don't want to affirmatively sign off on what

has been now made public.  And that's why I asked the question

earlier of plaintiff's counsel, What do you need this for?  And

what they tell me I think they need it for is hypothetical use

in their parallel litigation but having haven't yet had to

actually have a need for it.  Now maybe I'm being unfair to

plaintiff's counsel and I'll let them speak in a minute.  But I

don't know whether that's relevant to my analysis.  This is

FOIA.  It's not a question of what their ultimate purpose is.

But it sounds a little secondary to the original purposes of

FOIA.

          MR. ARONOFF:  I agree with that argument, your Honor,

although I acknowledge there's case law saying a particular

purpose for which a document is to be put is not relevant.

          I do want to touch on two points.

          THE COURT:  Go ahead.

          MR. ARONOFF:  The first point is the intelligence

review that plaintiffs attach as Exhibit 29.  I just want to be

clear that neither this document nor the Chelsea Manning

documents that plaintiffs cite really has anything of relevance

to say about these documents.  Plaintiffs cite, if your Honor

turns to page -- it's numbered page 12 of Exhibit 29.

          THE COURT:  Hang on a minute.

          MR. RADINE:  Is this the original?

Ich9oseo

 1          MR. ARONOFF:  Yes.  This is the original.

 2          THE COURT:  OK.  I'm there.

 3          MR. ARONOFF:  So plaintiffs say that this intelligence

 4   review, first of all, says that these cables on WikiLeaks were

 5   derived from a State database.  To say that something is

 6   derived from a database is not to say that it's identical.

 7   Much of modern English vocabulary is derived from French but

 8   that doesn't mean you can walk around in Paris speaking English

 9   and have people understand you.

10          The second point is that plaintiffs point to this

11   line-by-line review.  But the line-by-line review, particularly

12   when read alongside of the very first paragraph of this

13   document, it's clear that what the -- what's being discussed

14   here is a line-by-line review of underlying government

15   documents to address the question of:  Suppose these things

16   were released, what would the harm be to national security; not

17   the question of line-by-line comparing WikiLeaks documents

18   against any government document.  So this document here does

19   not suggest that the government has effectively come out and

20   said:  Yes, we've confirmed each line is the same and thereby

21   operates as some kind of official disclosure.

22          I don't expect -- this document, I think, was released

23   through FOIA.  Given the government's efforts since the time of

24   the WikiLeaks disclosures to make sure that it's not commenting

25   on any particular document, it would be surprising if this FOIA

Ich9oseo

1    release somehow effectively pulled the rug out from under the

2    entire government.

3           And, similarly, the Chelsea Manning testimony, that's

4    just the testimony of one felonious government employee.  It's

5    not an official disclosure.

6           I'd also note that those proceedings, the criminal

7    proceedings were closed to the public in that case whenever

8    classified information was going to be discussed specifically

9    because the government wanted to make sure that there were no

10   further harms to national security from the conduct of that

11   prosecution.

12          The other point -- if I had a separate thought, it's

13   vanished.

14          THE COURT:  And you're so young compared to those of

15   us who can't remember what we had for breakfast.

16          Let me hear -- I know plaintiff's counsel wanted to

17   say a few additional things.

18          MR. RADINE:  Sure.  As your Honor and defense counsel

19   noted, the principle underlying FOIA is not the purposes, of

20   course, that the requester has in requesting the information

21   but the disclosure that the government is encouraged to make.

22          I didn't want to overstate or let's say understate the

23   usefulness of these documents to us, however.  To the extent

24   that we haven't used them is in part the stage of the trials

25   we're at.  We have used them in expert reports where they can

Ich9oseo

1    apply their on expertise to the reliability of the document.

2    But the issue for us is definitely a real one.

3            But, again, the broader issue is the purpose of the

4    statute.  And, of course, WikiLeaks is not the only grounds

5    we've given for releasing these documents.  In part, it's also

6    a declaration that doesn't give itself over to ready analysis

7    or understanding especially given other information out in the

8    field.

9            The documents from the trial are not, of course, just

10   the IRTF report or Chelsea Manning's statements which are

11   unclassified.  We've not used any classified information here.

12   And her conviction and sentencing is premised on the fact that

13   this information was released to WikiLeaks.  It's been the

14   government's position in other filings, as included in our

15   briefings that, for instance, hundreds of thousands of

16   identifying codes of significant activity reports, also taken

17   by Chelsea Manning, were, quote, identical.

18           And lastly, of course, this is on top of the other

19   authentication evidence that we've presented.  I think the

20   larger takeaway is that both from an acknowledgment and

21   authentication standpoint we know what this information says.

22   Other countries have read it.  I think at this point it's sort

23   of beyond the stage of what is not anything but the public

24   information.

25           So, just to sum up, State has referenced a few times

Ich9oseo

1    in its briefs that it's, quote, not up to a private law firm to

2    decide what information is reasonably likely to harm national

3    security if released.  We don't disagree with that.  I think

4    it's up to an Article III Court.  And we'd respectfully ask you

5    to look at some of these materials and see if the declarations

6    provide enough information and whether adjustments, whether it

7    be redacting names, or producing information from President

8    Talabani, or so on can be made to help further that FOIA

9    principle.

10            That's it from us, your Honor.

11            THE COURT:  All right.  Yes.

12            MR. ARONOFF:  Sorry, your Honor.  I just have two

13   small points.  I think what we're getting to is really the kind

14   of -- the last question that the Court really must consider is

15   suppose that the content of the redactions and the WikiLeaks

16   versions of these documents, suppose it's the same, is there

17   still any harm that would result.  And on that point the second

18   Stein declaration, paragraph 26, makes clear that just as in

19   the Wilson case in which a letter on CIA letterhead signed by a

20   CIA employee saying, "Yes, you were employed for these dates"

21   has been published by Congress, the Second Circuit nonetheless

22   recognized that there is a particular harm that comes when

23   you're conducting something in secret and then you're forced to

24   come forward and acknowledge it publicly.

25            In the Stein declaration, Mr. Stein explains that when

1    there's unofficial information a foreign government doesn't

2    need to respond by basically accusing the United States itself

3    of lying.  That is the only thing that could be left if there

4    is an official statement from the United States that X

5    conversation occurred, that someone said something in this

6    particular way.  And those harms, they come from just the

7    acknowledgment itself.

8            This is what happens in leaks cases.  There might be a

9    New York Times article that says here are 20 unnamed sources

10   who all said the same thing.  But there's still value to the

11   government in not having to come forward and either confirm or

12   deny that information.  And that's true whether it's

13   intelligence information, or diplomatic information, or any

14   other sort of -- or information about an ongoing criminal

15   investigation.  That principle applies across all sorts of

16   domains of government.  And I recognize, of course, that FOIA

17   is a disclosure statute but it doesn't require the disclosure

18   of information when that disclosure would harm national

19   security.

20           And the very last point on the Chelsea Manning trial.

21   I don't have the citation before me but there is the most

22   recent appeal in that case which is from this year, the Armed

23   Forces Court of Appeals decision notes that Chelsea Manning

24   ultimately pled guilty only to releasing 75 State Department

25   cables.  And it notes that the larger file that contained

Ich9oseo

 1   250,000 files was corrupted.  So I don't -- that's a published

 2   opinion.  It's not classified.  It's clear from that document

 3   that the prosecution of Chelsea Manning does not by itself show

 4   that these 250,000 cables are, each of them, line-by-line

 5   identical to any official government document.

 6              THE COURT:  All right.

 7              MR. ARONOFF:  Thank you.

 8              THE COURT:  Thank you very much.

 9              MR. RADINE:  Could I have one more comment?

10              THE COURT:  Yes.

11              MR. RADINE:  Last one, your Honor, I promise.

12              I would just say that the citation to Wilson as to the

13   effect of officially acknowledging something versus not, we

14   referenced earlier that that appears in the CIA intelligence

15   context.  But I'd also point out that Wilson said the CIA's job

16   isn't done from identifying the harm generally which would be

17   embarrassment of a foreign power retaliation.  It then has to

18   specifically apply it.  And in the Stein declaration a single

19   paragraph essentially apes the language from Wilson but adds

20   diplomacy language rather than intelligence language.  We'd

21   have to go back and explain why specifically if Iraq were

22   forced to confront the reality that Maliki once said a nice

23   word about General Odierno, then the embarrassment would be too

24   much and national security would be thus harmed.  So it's a

25   specific showing that's not been made here.  I will not say

Ich9oseo

1    anything more after that.

2              THE COURT:  Very good.  This has been a very helpful

3    argument.  I will take the matter sub judice.  Get me the one

4    item I asked you to get me certainly within a week and I

5    will -- there's a lot here to review so I don't think I'll get

6    you an opinion until January but I'm sure I'll get to it by

7    January.

8              MR. RADINE:  Thank you, Judge.

9              MR. ARONOFF:  Thank you, your Honor.

10             (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25